FILED
June 28, 2019
8:00 AM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**
**(HEARD MAY 31, 2019 AT KNOXVILLE)**

| | | |
|---|---|---|
| Sheila Owens | ) | Docket No.  2017-01-0401 |
| | ) | |
| v. | ) | State File No. 44323-2015 |
| | ) | |
| Sitters, Etc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

---

**Affirmed and Remanded**

---

This is the second interlocutory appeal in this case.  The employee, a home health aide, sustained work-related injuries when she caught a patient who was falling.  She alleged the incident resulted in shoulder and low back injuries and aggravated a pre-existing cervical condition.  The employer accepted the shoulder and low back injuries as compensable but denied that any aggravation of the employee's pre-existing cervical condition arose primarily out of the work incident.  In a decision on the record, the trial court determined the employee presented sufficient proof of an aggravation of her pre-existing condition to establish she would likely prevail at trial and ordered the employer to provide medical benefits for the employee's cervical condition.  The employer appealed, and we reversed the trial court's order, concluding the expert medical proof preponderated against the court's finding that the employee established a compensable aggravation of her pre-existing condition.  Following the employee's second request for an expedited hearing, the trial court conducted an evidentiary hearing in which the employee and four additional lay witnesses testified.  The parties submitted the same depositions and medical records as were considered by the trial court in its decision on the record, but with the correction of a court reporter's error in one of the medical depositions.  Following the hearing, the trial court again granted the employee's request for treatment for her cervical condition, determining she would likely prevail at trial in establishing an aggravation of her pre-existing condition.  The employer has appealed. We affirm the trial court's order and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

1

Alex B. Morrison, Knoxville, Tennessee, for the employer-appellant, Sitters, Etc.

Ronald J. Berke, Chattanooga, Tennessee, for the employee-appellee, Sheila D. Owens

## Factual and Procedural Background

This is the second interlocutory appeal in this case. We set out the following factual and procedural background in our earlier opinion:

Sheila Owens ("Employee"), a fifty-four year-old nursing assistant employed by Sitters, Etc. ("Employer"), alleges she injured her shoulder, back, and neck while performing her work duties on June 9, 2015. She was assisting an elderly patient stand up from a seated position when the patient slipped, and she caught the patient and "put her in her [wheel]chair." The following day, Employee reported to her supervisor that she had injured her back and shoulder. She was instructed to seek care at a walk-in medical clinic. The medical provider ordered an MRI, and when Employee returned to the clinic she was referred to another medical provider based upon the results of the MRI.

Thereafter, Employee came under the care of two authorized orthopedic surgeons. Dr. Rickey Hutcheson was authorized to treat Employee's back, and Dr. Robert D. Mastey was authorized to treat Employee's shoulder. Employee told to [sic] Dr. Hutcheson on her initial visit that she was injured at work on June 9, 2015, and had been off work since.

He diagnosed Employee with a lumbar strain and prescribed medication and physical therapy. He treated Employee until January 2016, at which time he thought she had reached maximum medical recovery for her lumbar strain. Although he testified that Employee's pre-existing degenerative disc disease contributed to her symptoms, he stated "most of her symptoms [were] associated with the lumbar strain, which was greater than 51% causally related to work."

Dr. Mastey began treating Employee's shoulder in August 2015. His August 19, 2015 report reflects that Employee complained of "pain in her right shoulder with radiation down into her arm . . . [and] numbness and tingling of the arm," as well as "neck pain both on the right and left sides, which has worsened since the injury." The report also noted that he had treated Employee several years before her June 9, 2015 work injury "for severe neck pain and bilateral hand numbness." Dr. Mastey testified Employee's "shoulder problem is more than 51 percent related to the

2

[work] injury." He testified he discussed Employee's "neck problem" with her and her "carpal tunnel problems," noting she had a lengthy history of neck problems. However, he declined to offer an opinion regarding causation with respect to Employee's neck condition because he "wasn't treating her for her neck." Asked specifically whether he thought the neck complaints were related to the June 2015 work incident, he testified they "could very well be, but, I mean, this neck is such a bad problem it doesn't take much to trigger it off. I would have to defer that to Dr. Pearce."

During his deposition, Dr. Mastey was questioned repeatedly concerning Employee's pre-existing neck condition and whether he observed anything he would say was advanced by the work injury. He consistently responded that he was not following her for that condition and did not have an opinion. He placed Employee at maximum medical improvement for her shoulder condition in December 2017, but acknowledged the date could change in the event she underwent shoulder surgery. He testified he understood Employee had agreed to undergo another cervical surgery and that he could not determine whether shoulder surgery would be necessary until she recovered from her cervical surgery.

On March 1, 2016, Employee was seen by Dr. Alexander Roberts, a physical medicine and rehabilitation physician. The report of that visit states she was referred by her primary care physician for "complaints of cervical spine and [bilateral upper extremity] pain with [numbness and tingling] today." The report detailed Employee's prior medical care for her cervical spine, which began in 2000 and included surgeries in 2002, 2004, and 2008, physical therapy in 2012, and a CT scan in 2013. Dr. Roberts recorded Employee's report of a June 9, 2015 work injury, followed by conservative treatment and a referral to him for additional evaluation. Dr. Roberts ordered cervical CT and MRI studies and bilateral upper extremity EMG nerve conduction studies.

Employee returned to Dr. Roberts following completion of the recommended diagnostic studies. The cervical CT scan indicated degenerative disc disease at C3-4 and C5-6, anterior cervical fusion from C5-7 without vertebral screws in the C6 vertebrae, evidence of a fragment of the screw in the C6 vertebrae, and evidence of a fusion at C4-5 with a solid arthrodesis. The MRI revealed degenerative disc disease at C3-4 and C5-6, a disc bulge with an overlapping central disc protrusion at C3-4, and right and left stenosis at C3-4, C5-6, and C7-T1. The EMG nerve conduction study revealed "electrodiagnostic evidence of a right C5 and C6 radiculopathy with active denervation." Based upon these findings, Dr. Roberts referred Employee to Dr. Richard Pearce for a surgical evaluation.

3

Dr. Pearce first examined Employee on July 14, 2016, at which time he reviewed the diagnostic studies ordered by Dr. Roberts and recommended surgery. He noted in his initial report that he discussed treatment options, including surgery, and that Employee elected to proceed with surgery. Approximately one year later at Employee's next visit with Dr. Pearce, he noted she was "still trying to get [workers' compensation's] approval for surgery but having increased [numbness and tingling]." He recommended another MRI to assess whether she was developing myelomalacia, noting that Employee had some "increased radicular symptoms in the left upper extremity." He reported "she would like to avoid surgery so we will again try to see if there is anything more conservative we can do for her." Employee's attorney sent a letter to Dr. Pearce asking whether the need for the cervical surgery he had recommended in July 2016 was (1) "[c]aused by the new injury," (2) "[c]aused by the old condition being aggravated by the new injury," or (3) "[c]aused by the old injury." Dr. Pearce marked "yes" to the second question, but did not indicate a response to the first or third questions.

In his deposition, Dr. Pearce testified he was able to compare 2013 and 2016 CT scans, and stated the 2016 CT scan showed that the condition of Employee's spine at C3-4 was worse than it had been in 2013. Asked if he had an opinion whether the "condition at C3-4 was caused by her work-related injury in June 2015," he said he would "relate it" to that particular event. He was also asked whether Employee's June 2015 injury made her anatomical findings worse and answered, "[b]ased on the CTs, the area of C3-4 appeared to be worse."

On cross-examination, Dr. Pearce agreed that diagnostic studies prior to the June 2015 work incident evidenced anatomic changes in Employee's cervical spine. He said the only pre-injury diagnostic report he had was the CT scan performed in 2013. He was then shown and questioned about an MRI report from 2003, two MRI reports from 2007, two MRI reports from 2008, and an MRI report from 2013. He agreed the reports of the 2003 MRI and a March 2007 MRI did not show significant abnormalities, and that a report of an August 2007 MRI indicated a small disc protrusion at C3-4 without spinal cord deformity, which represented an anatomic change from the earlier MRI reports. He reviewed and was asked about the reports of two 2008 MRIs and stated the differences in the reports may only represent differing interpretations of the radiologists who prepared the reports. However, he agreed that a 2012 MRI report described a disc herniation at C3-4 that was "touching" the spinal cord. When asked whether, having considered the diagnostic reports that pre-dated the June 2015 incident, it was still his opinion that Employee's C3-4 problems were

4

"related" to the June 2015 injury as opposed to a progression of the condition at C3-4 since 2007, Dr. Pearce responded:

> Based on the reports that you have, there was obviously some early anatomic changes, some maybe degenerative changes, some bulging of the discs. Based on the MRI that I reviewed in 2016, the amount of cord compression and the size of that disc herniation was [sic] obviously much worse. And at what point that occurred between the last MRI of 2012 versus 2016 I cannot say except, based on her history, that she started having symptoms, and now we have a new MRI which shows a definite anatomic change.

Dr. Pearce agreed, however, that Employee's disc at C3-4 could have continued to "worsen without pain symptoms." He testified he could not say that the "worsening" occurred on or after the June 2015 incident, but "based on [Employee's] history when the symptoms got worse . . . I have to assume that's when that occurred."

On re-direct, Dr. Pearce testified that spondylolisthesis revealed by the 2016 MRI, which he described as a sign of instability in the spine, was not indicated in the 2012 MRI report. The 2016 MRI also revealed stenosis and a broad-based disc bulge at C3-4 that were not identified in the 2012 MRI report. He was again asked about causation and whether Employee's condition at C3-4 was "proximally" caused by the work injury:

> Q. And if you consider the history given to you, your examinations, the various testing that I've asked you about that you've discussed and defense counsel has asked you about, along with her entire records and her entire course of treatment, is it still your opinion to a reasonable degree of medical certainty that her condition at C3-C4 was proximally caused by her work-related injury in June 2015?
>
> A. Yes, sir, based on her history.
>
> Q. And also with the same hypothetical, to a reasonable degree of medical certainty, it is still your opinion that the work-related injury in June 2015 caused a worsening of her anatomical condition at C3-4?
>
> A. Again, comparing the pre- and post-injury MRIs, there's definitely been an anatomic change. There's no way

5

for me to say that that change occurred on that specific day, but based on her history, there has been worsening.

Q.      If you include her history in the hypothetical –

A.      Then I assume it was made worse on that date.

In December 2016, Employer sought an independent medical evaluation with Dr. Jay E. Jolley, an orthopedic surgeon.  Dr. Jolley noted Employee had undergone three cervical spine surgeries.  He attributed the condition of Employee's cervical spine to degeneration that he thought did not result from the work injury.

[Employee] does have significant degeneration at C3-C4. This has led to some spinal stenosis, which appears to be non-traumatic and simply acquired.  I believe this is causing some radiating arm pain into the right shoulder region.  However, this clearly is not traumatic and not from the lifting incident that occurred in June 2015, which does appear to be more related to the history of lumbar sprain and the shoulder strain and possible cuff tear that Dr. Mastey is treating. . . . Again, I do not believe this is from the work injury in June 2015 but rather a degenerative and acquired condition adjacent to the previous fusion at C4-C5.

Dr. Jolley testified that the surgery Dr. Pearce recommended was a reasonable option for Employee, but stated, "I don't see how that would be related directly to the incident of 2015."  He testified his assessment was that Employee's "pains in her right arm were due to the stenosis at C3-C4 . . . which would typically be from bone spurs and essentially arthritis." When asked about his diagnoses and whether those conditions were caused by the June 9, 2015 incident, he testified "the lumbar sprain would be related to the 2015 incident," but as to the right partial rotator cuff tear, he stated he "would probably defer" to other experts as he does not consider himself a "shoulder expert."  He added that "the cervical issues appear to be chronic and pre-existing."

Dr. Jolley admitted that Employee could have "tweaked her spinal condition" in the June 2015 incident, making it somewhat worse.  He was asked on cross-examination about the letter Employee's attorney sent to Dr. Pearce and whether he agreed with Dr. Pearce's response to the second question concerning whether the recommended surgery was "caused by the old condition being aggravated by the new injury."  He responded:

It sounds like she had an uptick in pain following [the June 2015] incident. Again, 'uptick' meaning she had complaints clearly, and rightly so, with her neck prior to the incident. So did that incident that day aggravate her neck and cause her some increased pain? It appears so, yes. . . . But again, at the same time . . . can I sit there and say, you know, the incident is more responsible for her need of surgery? No, I cannot. I would say that her overwhelming degeneration and arthritis at that level is causing her significant pain and is more responsible than the incident.

Dr. Jolley was pressed about the second question on the letter sent to Dr. Pearce and was asked, "[y]es or no, do you agree with Dr. Pearce's statement where he checked it on [number] 2." Dr. Jolley responded, "[y]es."

*Owens v. Sitters, Etc.*, No. 2017-01-0401, 2018 TN Wrk. Comp. App. Bd. LEXIS 26, at *1-12 (Tenn. Workers' Comp. App. Bd. May 29, 2018) (footnote omitted).

In lieu of convening an evidentiary hearing, the trial court issued a decision on the record in which it concluded Dr. Jolley and Dr. Pearce agreed that Employee's neck complaints resulted from her work injury. The court ordered Employer to provide a panel of orthopedic surgeons for treatment of Employee's cervical injury. Employer appealed, and we reversed the trial court and remanded the case. Specifically, we found Dr. Pearce's medical opinions were insufficient to establish a compensable aggravation of a pre-existing condition, noting he had been asked whether Employee's cervical condition was *proximally* caused by her work accident. Additionally, we disagreed with the trial court's characterization of Dr. Jolley's opinion as "agree[ing] with Dr. Pearce's opinion."

Employee subsequently sought clarification from the court reporter regarding the use of the word "proximally" as appearing in Dr. Pearce's deposition. The court reporter submitted an affidavit attesting to the fact that there was a transcription error and that the transcript should have reflected that the question asked of Dr. Pearce was whether the work accident was the *proximate* cause of Employee's cervical complaints. Following Employee's second request for an expedited hearing, the court convened an evidentiary hearing at which Employee and four lay witnesses testified. In particular, Employee testified as to the effect that her injuries had on her activities and abilities. The trial court found Employee to be a credible witness, found that Dr. Pearce offered the more convincing testimony concerning causation, and concluded that, when considering the expert medical proof combined with the lay testimony, Employee had presented sufficient evidence to establish she would likely prevail at trial on the issue of causation. Employer has appealed.

7

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2018). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2018).

## Analysis

Employer asserts a single issue on appeal: whether the trial court "erred in ignoring the prior Order of [the Appeals Board] and once again ordering the Employer to pay for the Employee's alleged neck injury." We conclude the trial court did not err in ordering Employer to provide a panel of physicians for treatment of Employee's cervical injury.

Although Employer frames the issue as suggesting the trial court ignored our prior decision, the trial court conducted an evidentiary hearing following our remand of the case in which it considered additional lay testimony as well as the court reporter's affidavit correcting the question presented to Dr. Pearce in his deposition. The first appeal was from an interlocutory order of the trial court, as is this appeal. As we have previously observed, decisions made by a trial court in interlocutory proceedings may be changed at any time prior to the entry of a final judgment. *See* Tenn. Code Ann. § 50-6-239(d)(3) ("Unless modified by the workers' compensation appeals board following an appeal *or* unless a subsequent order to modify an interlocutory order for temporary or medical benefits is issued by the workers' compensation judge presiding over the claim, the interlocutory order shall remain in effect pending conclusion of the matter by hearing according to the procedure provided in subsection (c)." (emphasis added)). Our prior opinion, in which we concluded Employee had not presented sufficient evidence to establish she would likely prevail at a hearing on the merits, did not foreclose the opportunity for Employee to present additional evidence in a subsequent expedited

hearing or for the trial court to determine from the evidence "that the injured employee would likely prevail at a hearing on the merits." Tenn. Code Ann. § 50-6-239(d)(1).

Accordingly, we turn to whether Employee met her burden of establishing she would likely prevail at trial on the issue of causation concerning her cervical condition. As previously noted, there is a presumption that the trial court's factual findings are correct, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-239(c)(7). Unlike the first appeal, this appeal follows an evidentiary hearing at which Employee and other lay witnesses testified in person. The trial court found Employee's testimony to be credible, and that finding is entitled to deference on appeal. *See Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008).

Following the evidentiary hearing, the trial court weighed the medical evidence and the opinions of the physicians addressing causation for Employee's cervical injury. The trial court noted that Dr. Pearce had seen Employee on several occasions while Dr. Jolley performed a one-time evaluation. The trial court additionally noted that Dr. Pearce reviewed more of Employee's diagnostic tests during his deposition and contrasted that to Dr. Jolley's having reviewed a limited number of tests and testifying he anticipated additional tests would show progressive, degenerative changes. Also, the trial court noted that Dr. Pearce based his opinions on diagnostic tests that demonstrated anatomic changes "along with the history given by [Employee]." Moreover, Dr. Pearce responded to a question in his deposition that was incorrectly transcribed as whether Employee's work was the "proximal" cause of her neck complaints. In our earlier opinion, we observed that the term "proximal" described a temporal relationship rather than a causal one, and we concluded that Dr. Pearce's testimony was insufficient to meet the requirements of the definition of injury set out in Tennessee Code Annotated section 50-6-102(14).

However, we conclude the opinion expressed by Dr. Pearce in light of the typographical correction, when considered within the context of his entire deposition testimony and in conjunction with Employee's testimony, is sufficient evidence from which the trial court could properly determine that Employee would likely prevail at trial in establishing causation for her cervical complaints.[1]

---

[1] Generally, proximate cause is a concept applicable to tort cases and is not a part of the framework of workers' compensation's no-fault determination of compensability. Our conclusion that the use of the term "proximately," in conjunction with other medical and lay proof, is sufficient to find Employee met her burden of establishing she will likely prevail at trial should not be interpreted as indicating a physician's opinion regarding the "proximate cause" of an injury will be sufficient to carry the day at trial. To prevail at trial, an employee must satisfy the requirements of a compensable injury as set out in Tennessee Code Annotated section 50-6-102(14). *See Panzarella v. Amazon.com, Inc.*, No. 2015-01-0383, 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (Tenn. Workers' Comp. App. Bd. May 15, 2017).

Finally, Employer asserts the trial court "misread or mischaracterized" Dr. Mastey's testimony in concluding he did not offer an opinion regarding the cause of Employee's cervical complaints. Employer asserts Dr. Mastey provided an opinion that the cervical injury is not causally related to the employment and that, as the authorized physician, his opinion is entitled to a presumption of correctness. A review of the entirety of Dr. Mastey's testimony reveals that he did not offer an opinion regarding the cause of Employee's cervical complaints.

When asked whether he had "an opinion at that time as to causation of the neck complaints," he responded "[n]o. I wasn't treating her for her neck." When asked whether Employee's neck complaints were related to the work accident, he stated they "could very well be, but, I mean, this neck is such a bad problem it doesn't take much to trigger it off. I would have to defer that to Dr. Pearce . . . . I wasn't treating her neck." When asked whether the work incident advanced her pre-existing problems in her neck, he responded that he "wasn't following her for her neck. I don't – I don't have an opinion on that." And, finally, when asked whether he agreed with Dr. Pearce that the work accident aggravated Employee's pre-existing cervical condition, he stated "I don't have an opinion. I would have to defer to Dr. Pearce." Dr. Mastey repeatedly and unequivocally stated that he was not treating Employee for her neck complaints, that he did not have an opinion with respect to causation, and that he would defer to Dr. Pearce.

In short, the entirety of Dr. Pearce's testimony, considered in conjunction with Employee's testimony concerning her history and the effect of her injuries on her activities and abilities, supports the trial court's conclusion that Employee is likely to prevail at trial in establishing the compensability of her cervical injury.

## Conclusion

For the foregoing reasons, we affirm the trial court's decision and remand the case. Costs on appeal are taxed to Employer.



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Sheila Owens | ) | Docket No. 2017-01-0401 |
| | ) | |
| v. | ) | State File No. 44323-2015 |
| | ) | |
| Sitters, Etc., et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Audrey A. Headrick, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 28th day of June, 2019.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Ronald J. Berke | | | | | X | ronnie@berkeattys.com margo@berkeattys.com |
| Alex B. Morrison | | | | | X | abmorrison@mijs.com |
| Audrey A. Headrick, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | penny.patterson-shrum@tn.gov |

Jeanette Baird
Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-0064
Electronic Mail: WCAppeals.Clerk@tn.gov